IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.   09-cv-02087-WYD-KLM

SAMMIE LEE DENSON, JR.,

      Plaintiff,

v.

MAJOR L. MAIFELD and
JOHN DOES 1-20,

      Defendants.

---

## ORDER

---

THIS MATTER comes before the Court on Defendant Major Linda Maifeld's

Motion for Summary Judgment [ECF No. 97], filed September 15, 2011.   Plaintiff

Sammie Lee Denson, Jr. responded to the Motion on October 11, 2011 [ECF No. 101],

and Defendant submitted a reply on October 15, 2011 [ECF No. 103].   Having

considered the Motion, response, and reply, I enter the following written Order.

### RELEVANT FACTS

I note that the parties tendered voluminous facts and evidence in this case.   I

have not discussed every fact tendered by the parties, only those that are most material

to my findings.   I have, however, reviewed and considered all the facts and evidence.

Where the facts are unsupported by evidence, are argumentative, and/or are

conclusory, I have disregarded those facts.   Also, where the facts are undisputed, I

have not cited to the record.   I have, however, construed all of the facts in the light

most favorable to Plaintiff as I must for purposes of this summary judgment motion.
*See Carolina Cas. Ins. Co. v. Yeates*, 533 F.3d 1202, 1204 (10th Cir. 2008).

Plaintiff Sammie Lee Denson was at all relevant times an inmate in the Colorado Department of Corrections ("CDOC").   Defendant Major Linda Maifeld was at all relevant times the Custody and Control Manager at the Colorado Territorial Correctional Facility ("CTCF").   Plaintiff was transferred to CTCF in November 2007.

On December 1, 2007, Plaintiff's cell was shaken down.   In it was found a letter, in his handwriting, to a female acquaintance, requesting her to bring narcotics to the facility through the visiting program, so that he could sell them for profit.   On December 3, 2007, Defendant ordered Plaintiff's removal from the general population and placement into segregation pending an investigation into whether his actions warranted disciplinary action under the Code of Penal Discipline ("COPD").   On December 17, 2007, a hearing was held in which Plaintiff had an opportunity to be heard and present testimony and documentary evidence.   Plaintiff waived a three-member panel, and Lieutenant Ken Topliss served as the sole member of the COPD hearing board. Plaintiff was found guilty of attempting to deal in dangerous drugs, a Class I, Rule 13 violation of the COPD, and sanctioned with punitive segregation for the sixteen days he had already served, from December 1, 2007 until December 17, 2007.   Defendant did not have any involvement in the investigation or in the COPD disciplinary hearing.

Defendant then made the decision to continue Plaintiff's placement in segregation, even though Plaintiff was eligible to return to general population on December 17, 2007.   Defendant contends that this was so that a determination could

2

be made as to whether Plaintiff should be recommended for placement in administrative segregation, and if so, so that the formal hearing process could be completed.   (Maifeld Aff. [Ex. A] ¶ 13.)   Defendant further contends that she recommended to Lieutenant Tom Beneze, the facility's intelligence officer, that he begin the investigation as to Plaintiff's classification.   (Ex. A ¶15.)   Plaintiff, however, contends that Defendant did no such thing, as the investigation was already underway.   (*See* Beneze Dep. [Ex. G] 22:5-15.)[1]   Plaintiff further contends that there is no informal investigative process for an administrative segregation hearing.   (Ex. G 9:7-9.)

Administrative Regulation (AR) 600-01, the controlling document for removing a prisoner from population, provides:   "The offender shall be returned to the general population within ten working days after removal, unless reclassification, disciplinary, or administrative segregation procedures have been initiated.   In the event that any one of these procedures has been initiated, the time limits of the applicable policy shall be followed."   (Administrative Regulation (AR) 600-01(IV)(M)(1)(d) [Ex. A, Attachment 2]). The introduction of narcotics, or attempt thereof, into a facility is treated very seriously in the prison system because such actions can jeopardize the safety and security of other offenders and staff within the facility.   Administrative segregation is used, in part, to manage offenders who pose a threat to the security of the facility.   There is no language in AR 600-01 that grants Defendant the authority to continue a removal from population order, but Defendant claims it is inherent in her job duties and

---

[1] I cannot consider Plaintiff's contention that as he was gathering his belongings to return to general population, Sergeant Cocharon of CTCF informed him that he would not be allowed back to general population and that Defendant continued his removal indefinitely, because it constitutes inadmissible

responsibilities.

Plaintiff wrote Defendant at least one letter.   Defendant claims she received only one letter (Ex. A ¶ 16; Ex. O ¶ 2), written while Plaintiff was in segregation pending the administrative segregation process.   Plaintiff, on the other hand, asserts that he wrote four letters while in punitive segregation pending the result of the investigation into his COPD violation, and that the letter to which Defendant refers was dated December 15, 2007 (Ex. F ¶ 3).[2]   The letter or letters intended to appeal Plaintiff's removal from population and placement in segregation, and contained allegations that Plaintiff was being unfairly targeted due to his race.   Plaintiff also claims he said he had been targeted based on religion.   (*See* Ex. F ¶ 8.)   In the December 15 letter (or, according to Defendant, the only letter), Plaintiff referred to Defendant as the "great one" and "superior one."

After receiving the letter or letters, Defendant spoke with Plaintiff on December 18, 2007.   Defendant claims she visited Plaintiff in segregation to explain to him that his time in segregation was extended pending a classification review.   (Ex. A ¶ 21.) Plaintiff claims that Defendant, together with Lieutenant Beneze, brought Plaintiff to the hearing room on December 18, 2007, and confronted him about the letters.   (Ex. F ¶19.)   No member of the hearing board was present during this conversation.   During this conversation Plaintiff apologized for writing the letter in question, but again

---

hearsay.   *See Bryant v. Farmer's Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).
[2]  The evidence presented by Plaintiff is not entirely clear that the December 15 letter came last in time, but there is that implication in the presentation of evidence and in Plaintiff's response to the Motion. Because of the deference I must give to Plaintiff in construing the facts in this Motion for Summary Judgment, I will view the facts liberally as if this letter was the last in time.

suggested that he was a victim of unfair treatment and discrimination by Defendant.

Plaintiff contends that Defendant responded that CTCF "is her prison," "that she will

treat any prisoner how ever [sic] she sees fit," that Plaintiff was calling her a racist, and

that she would send him to the Colorado State Penitentiary, CDOC's maximum

administrative segregation facility, and have him locked in administrative segregation for

several years.   (Denson Aff. [Ex. F] ¶¶ 14, 16.)   The parties dispute whether Plaintiff

referred to self-injurious behavior during this conversation and whether Defendant

placed him on suicide watch.   (*See* Ex. A ¶¶ 22-24; Ex. F ¶¶ 18-20.)

Plaintiff received a Notice of Administrative Segregation Hearing on January 8,

2011, which changed his official status from removed from population, to segregated

prior to an administrative segregation hearing.   The hearing was conducted on January

11, 2008.   A three-member panel, consisting of Lieutenant J. Evans, Lieutenant D.

Brightwell, and committee chairperson Dave Allen, determined that there was

substantial evidence justifying Plaintiff's placement in administrative segregation.

Specifically, the panel found that Defendant was attempting to have drugs introduced

into CTCF by a female visitor, and that his conduct posed a serious threat to the

security of the facility.

The parties have submitted the audio recording of the hearing.   (Attachment to

Ex. B.)   I have listened to the recording to the best of my ability, though I note that it is

not clearly audible in places.   During the hearing, Plaintiff made a six-minute statement

through which he stated his defenses against placement in administrative segregation,

and was given an opportunity to present further evidence.   Before the panel

5

deliberated, Nona O'Malley, the initiating employee for the hearing, stated that she "would like the board to consider that [Plaintiff] had been report-free for . . . almost five years . . . ."  She also stated something with respect to the fact that the letter that led to his punitive segregation was merely found in his room, and she suggested an appropriate placement (which is unfortunately inaudible).   Plaintiff contends that these statements suggest that she did not agree with the panel's decision to place him in administrative segregation.

On January 8, 2008, Plaintiff wrote the administrative segregation committee to request that the letters he wrote to Defendant be presented as evidence at the hearing. (Ex. B, Attachment G; Ex. F ¶ 22.)   Plaintiff contends that this letter was written before the hearing, and that he never received copies of the letters or was allowed to present them at the hearing.   (Ex. F ¶¶ 22-23.)   In the audio recording of the hearing, it is evident that when asked about evidence to present, Plaintiff mentioned letters he had written to various individuals, including the four letters to Defendant.   (Attachment to Ex. B.)

On January 23, 2008, Plaintiff appealed the decision to the facility's Administrative Head, who upheld the decision on February 12, 2008.   Plaintiff was housed in administrative segregation after the hearing until March 28, 2008, when he was transferred to CSP.   Plaintiff was housed in administrative segregation at CSP until October 28, 2008.   It is undisputed that Defendant initiated the reclassification

process that led to Plaintiff's placement in administrative segregation, and that he would

6

have returned to population had Defendant not initiated this process.

The conditions of Plaintiff's segregation while he was in administrative segregation were the same as when he remained removed from population prior thereto.   CDOC states that there is a dramatic difference between the conditions of confinement in administrative segregation as compared to general population.   Plaintiff was placed in a cell approximately eight feet by ten feet, to which he was confined for twenty-three hours per day, with only one hour allotted for exercise five days a week. The lights in his cell remained on for twenty-four hours per day.   He was afforded limited contact with other inmates and prison personnel.   Furthermore, administrative segregation in the CDOC system has no definite timeline for release.   Prisoners may spend their entire period of incarceration in administrative segregation, and on average, they spend a minimum of eighteen months in administrative segregation.   After his time in administrative segregation Plaintiff suffered blood clots and blood flow problems in his legs, has been diagnosed with mental illness, and suffers from anxiety, fearfulness, and depression.

**ANALYSIS**

Plaintiff contends that Defendant violated his First Amendment right against relation and Fourteenth Amendment[3] right to procedural due process.   Plaintiff alleges that Defendant violated these rights through two separate acts: (1) the decision to continue his removal from population on December 17, 2007, until January 8, 2008, and

---

[3] Plaintiff actually says "First and Eighth Amendment Rights" (Resp. 13-14), but there are no allegations of cruel and unusual punishment in violation of the Eighth Amendment.   Rather the allegation is violation of procedural due process, which is provided by the Fourteenth Amendment.

(2) the "orchestration" of Plaintiff's "indefinite placement in administrative segregation," which lasted until October 28, 2008.   (Resp. 13.)   Defendant has moved for summary judgment on all of Plaintiff's claims.   Defendant denies having violated any of Plaintiff's constitutional rights, and additionally raises the defense of qualified immunity.

## A.   Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "When applying this standard, [the court must] view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."   *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   *Id.* (quotation omitted).

 "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."   *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).   "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."   *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.   *Id.*   All doubts must be resolved in favor of the existence of triable

issues of fact.   *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

In order to rebut a motion for summary judgment, an opposing party must present evidence permitted by Rule 56 setting forth specific facts that would be admissible at trial.   Fed. R. Civ. P. 56(e)(2); *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).   Accordingly, speculation, opinion, or hearsay testimony is "not suitable grist for the summary judgment mill."   *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) (quotation omitted); *see also Bryant*, 432 F.3d at 1122 ("it is clear that (1) the content of summary judgment evidence must be generally admissible and (2) if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.,* the evidence must be based on personal knowledge.").   In addition, "the court may not rely on the assertions of legal counsel for the existence of factual allegations."   *Dean v. Allstate Ins. Co.*, 878 F. Supp. 1397, 1401 (D. Colo. 1993).

**B.     Qualified Immunity Standard**

"The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Toevs v. Reid*, 685 F.3d 903, 910 (10th Cir. 2012) (quotations omitted).   "Thus, to avoid judgment for the defendant based on qualified immunity, the plaintiff must show that the defendant's actions violated a specific statutory or constitutional right, and that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue."   *Id.* (quotation

omitted).

The court has discretion to address the two prongs of this analysis in whatever order is appropriate under the circumstances. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).   I will exercise my discretion to address Plaintiff's two claims differently.   With respect to the procedural due process claim, I find it appropriate to proceed straight to the prong of deciding whether Defendant committed a violation of Plaintiff's constitutional right that was clearly established.   And with respect to the retaliation claim, I will address the alleged violation first and then turn to whether that violation was of a clearly established right.

The Tenth Circuit recently reviewed the standard for determining whether a violation is "clearly established":

> Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.   It is not necessary, however, to find cases that are fundamentally similar or even materially similar, because officials can still be on notice that their conduct violates established law even in novel factual circumstances.   The salient question is whether the state of the law at the time of the actions gave respondents fair warning that their conduct was unconstitutional.

*Id.* at 916 (internal quotations, alterations, and citations omitted).

**C.    Defendant's Involvement**

As a preliminary matter, I must clarify the extent of Defendant's involvement in

the pertinent events at issue here.   Plaintiff contends that Defendant committed two separate violations of his constitutional rights: 1) the decision on December 17, 2007, to continue his removal from population, which lasted until January 8, 2008, and 2) the "orchestration" of Plaintiff's "indefinite placement in administrative segregation," which lasted from January 8, 2008, until October 28, 2008.   (Resp. 13.)

It is undisputed that Defendant made the decision to keep Plaintiff in segregation after the December 17, 2007 hearing on punitive segregation.   It is also undisputed that Defendant initiated the reclassification process and that Plaintiff would have returned to population had this not occurred.   However, Plaintiff simply has not produced evidence to support his allegations that Defendant "orchestrated [his] indefinite placement in administrative segregation," prevented Plaintiff from having a meaningful opportunity to present evidence against his placement during the January 11, 2008 hearing, and had already determined the decision as to his placement prior to the hearing.   (*See, e.g.*, Resp. 13.)   The uncontroverted evidence with respect to Plaintiff's period of administrative segregation after January 11, 2008 is the following:

- On January 11, 2008, a three-member panel determined that there was substantial evidence justifying Plaintiff's placement in administrative segregation. Specifically, the panel found that Defendant was attempting to have drugs introduced into CTCF by a female visitor, and that his conduct posed a serious threat to the security of the facility.   At the hearing, Plaintiff made a six-minute statement and was given an opportunity to present further evidence.

- On January 23, 2008, Plaintiff appealed this decision to the facility's

11

Administrative Head, who upheld the decision on February 12, 2008.

- Plaintiff was housed in administrative segregation, first at CTCF, and then at the Colorado State Penitentiary (CSP), until October 28, 2008.

Plaintiff has presented no evidence that Defendant exerted any influence over the hearing and appeal process.   The only pertinent factual contentions for which Plaintiff provides evidentiary support are: 1) Plaintiff's inability to present as evidence various letters, including letters to Defendant; 2) the statements of Nona O'Malley, the initiating employee for the hearing; and 3) the December 18, 2008 confrontation during which Defendant told Plaintiff she would sent him to CSP and have him held in administrative segregation for several years.   Even accepting Plaintiff's contention that O'Malley's statements suggest disagreement with the panel's placement of Plaintiff in administrative segregation, the suggestion of one person's disagreement with the decision, along with an inability to present a specific form of evidence, is simply insufficient to support any reasonable inference that Defendant "orchestrated" the hearing and appeal process.   And with respect to Defendant's alleged underlying threat, Plaintiff has presented no evidence that this threat was carried out in any way.   I thus find that Defendant's involvement in the relevant events was limited to her decision to keep Plaintiff removed from population on December 17, 2008, until January 8, 2008. This determination informs my analysis of Plaintiff's claims going forward.

**D.     Due Process**

"The Fourteenth Amendment's Due Process Clause protects persons against

12

deprivations of life, liberty, or property; and those who seek to invoke its procedural

protection must establish that one of these interests is at stake." *Wilkinson v. Austin*,

545 U.S. 209, 221 (2005). "In the penological context, not every deprivation of liberty

at the hands of prison officials has constitutional dimension. This is so because

incarcerated persons retain only a narrow range of protected liberty interests." *Rezaq*

*v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012). "A protected liberty interest only

arises from a transfer to harsher conditions of confinement when an inmate faces an

"'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'""

*Id.* (quoting *Wilkinson*, 545 U.S. at 221 (quoting *Sandin v. Conner*, 515 U.S. 472, 484

(1995)) (alteration in original)).

In *Rezaq*, the Tenth Circuit recently held that the proper approach to the liberty

interest analysis "is a fact-driven assessment that accounts for the totality of conditions

presented by a given inmate's sentence and confinement." *Id.* at 1012. The court

further guided: "In cases involving placement in nondisciplinary administrative

segregation, it is appropriate to compare the conditions at issue with those ordinarily

experienced by inmates with similar records and sentences. In making this

assessment, we are mindful that nondisciplinary administrative segregation is the sort of

confinement that inmates should reasonably anticipate receiving at some point in their

incarceration." *Id.* (quotation omitted).

The liberty interest analysis includes four "potentially relevant, nondispositive

factors" in the liberty interest analysis: (1) whether "the segregation relates to and

furthers a legitimate penological interest, such as safety or rehabilitation"; (2) whether "the conditions of placement are extreme"; (3) whether "the placement increases the duration of confinement"; and (4) whether the placement is indeterminate. *Id.* Both parties have couched their arguments within these four factors, and I find it appropriate to apply the four factors in my analysis. *See id.*

In arguing that Defendant's violation of his procedural due process rights is clearly established, Plaintiff relies exclusively on the Supreme Court's holding in *Wilkinson.* However, in *Rezaq* the Tenth Circuit observed with respect to *Wilkinson* that "it is clear that the Supreme Court did not intend for courts to make side-by side comparisons of challenged conditions and the conditions in that case." *Id.* at 1015. Furthermore, the court "read *Wilkinson* to say that extreme conditions in administrative segregation do not, on their own, constitute an 'atypical and significant hardship' when compared to 'the ordinary incidents of prison life.'" *Id.* (quoting *Sandin*, 515 U.S. at 484). Rather, the Supreme Court in *Wilkinson* "ultimately placed the weight of its analysis on the indeterminate duration of confinement and the effect the placement had on an inmate's parole eligibility." *Id.* at 1012-13 (citing *Wilkinson*, 545 U.S. at 214).

Here, Plaintiff "admits that his placement in administrative segregation does not currently impact the length of his confinement." (Resp. 16.) Thus, with the recent guidance from the Tenth Circuit in mind, I turn to the application of the remaining three of four relevant factors, and ultimately find that Defendant is entitled to qualified immunity because there is no clearly established law supporting a finding that Plaintiff possessed a protected liberty interest.

14

### 1.    Relation to Legitimate Penological Interest

Plaintiff contends that his placement in administrative segregation did not relate

to or further a legitimate penological interest, but rather that a reasonable jury could

infer that Defendant continued his removal from population in retaliation for the

accusations of racism in his letters.   Citing the Supreme Court's "admonition that

'federal courts ought to afford appropriate deference and flexibility to state officials trying

to manage a volatile environment,'" the Tenth Circuit has held that "it is sufficient to

show a reasonable relationship between isolation and the asserted penological

interests."   *Rezaq*, 577 F.3d at 1014 (quoting *Sandin*, 515 U.S. at 482).

Notwithstanding my findings below with respect to Plaintiff's retaliation claim, and

given the level of deference afforded to Defendant, I find that there is a reasonable

relationship between Plaintiff's continued removal from the general population on

December 17, 2007, and the interest asserted by Defendant in maintaining the safety

and security of the prison.   It is undisputed here that the introduction of narcotics, or

attempt thereof, into a facility is treated very seriously in the prison system because

such actions can jeopardize the safety and security of other offenders and staff within

the facility.

Plaintiff argues that Defendant did not have authority to remove him from

population and violated regulations by not returning Plaintiff to population within ten

days of the end of punitive segregation.   However, even considering only this evidence

and disregarding Defendant's evidence that her actions were within her inherent

authority, this alleged violation of regulations does not support a finding of a clearly

established constitutional violation.   While Plaintiff has cited to authority stating that

"[p]rison officials must follow their own policies," *Muñiz v. Richardson*, 371 F. App'x 905,

909 (10th Cir. Mar. 31, 2010) (citing *Mitchell v. Maynard*, 80 F.3d 1433, 1445 (10th

Cir.1996)), Defendant has also pointed to authority in the due process context holding

that violations of prison regulations do not constitute cognizable constitutional claims.

*See Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002) (citing *Adickes v. S.H.

Kress & Co.*, 398 U.S. 144, 150 (1970)); *see also Hovater v. Robinson*, 1 F.3d 1063,

1068 n.4 (10th Cir. 1993) (holding in the Eighth Amendment context that "a failure to

adhere to administrative regulations does not equate to a constitutional violation." (citing

*Davis v. Scherer*, 468 U.S. 183, 194 (1984))).   Thus, there is no clearly established law

supporting a finding of a constitutional violation here, and the first factor weighs in favor

of a finding of qualified immunity.

### 2.    Extremity of Conditions

The factor of whether conditions of confinement are extreme also weigh toward a

finding of qualified immunity.   The conditions of Plaintiff's confinement were similar to

those in *Wilkinson* and in a recent unpublished Tenth Circuit case.   *See Wilkinson*, 545

U.S. at 223-24 ("almost all human contact is prohibited, even to the point that

conversation is not permitted from cell to cell; the light, though it may be dimmed, is on

for 24 hours; exercise is for 1 hour per day, but only in a small indoor room."); *Stallings

v. Werholtz*, No. 12-3028, 2012 WL 2626942, at *4 (10th Cir. July 6, 2012) ("Stallings

alleges he was kept in a seventy-square-foot cell for at least twenty-three hours a day.

He also explains that he is limited to five hours outside his cell each week, and any

16

visits with family are conducted via videoconferencing.").   As stated by the Supreme

Court in *Wilkinson* and more recently emphasized by the Tenth Circuit in *Rezaq* and

*Stallings*, these conditions do not support a finding of a protected liberty interest,

because they are substantially similar to conditions routinely imposed in solitary

confinement or administrative segregation.   *Wilkinson*, 545 U.S. at 224; *Rezaq*, 677

F.3d at 1015; *Stallings*, 2012 WL 2626942, at *4.   Plaintiff also has presented evidence

that Defendant was responsible for his placement in suicide watch, but this evidence

would not advance Plaintiff's claim across the threshold to a finding of a clearly

established constitutional violation.

### 3.   Indeterminacy of Placement

Again, the Supreme Court's holding in *Wilkinson* was determined by the third and

fourth factors that the placement increased the duration of confinement and was

indeterminate.   *Rezaq*, 677 F.3d at 1012-13 (citing *Wilkinson*, 545 U.S. at 214).

Plaintiff has conceded the third element, so I turn to the analysis of whether his

confinement was indeterminate.   Defendant kept Plaintiff in removal from population on

December 17, 2007, Plaintiff received a Notice of Administrative Segregation Hearing

on January 8, 2008, and the hearing occurred on January 11, 2008.   My analysis does

not go past this point in time, because of my finding above that Defendant was not

involved in the administrative segregation hearing.   Confinement of three weeks is not

indeterminate.   *See, e.g.*, *Rezaq*, 677 F.3d at 1016 (availability of twice-yearly reviews

suggests that confinement is not indefinite); *cf. Wilkinson*, 545 U.S. at 224

(establishment of liberty interest was supported by placement that was indefinite and,

17

after an initial 30-day review, reviewed just annually).   Thus, this factor also weighs toward a finding of qualified immunity.

**Summary**

Having applied the four factors relevant to the liberty interest analysis, and particularly in light of the recent guidance from the Tenth Circuit in *Rezaq*, I find that there is no clearly established law supporting a finding that the conditions of Plaintiff's confinement from December 17, 2007 to January 8, 2008 constituted a protected liberty interest.   Thus, the procedural due process inquiry ends here, and I find that Defendant is entitled to qualified immunity and summary judgment on this claim.

**E.    Retaliation**

I now turn to Plaintiff's claim that Defendant's decision to keep him in segregation on December 17, 2007 was in retaliation to the letters he had written her, in violation of his First Amendment rights.   "Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights."   *Allen v. Avance*, No. 11-6102, 2012 WL 2763508, at *5 (10th Cir. July 10, 2012) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (internal quotation marks and alterations omitted)).   A plaintiff must establish three elements to prove a First Amendment retaliation claim:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

18

*Id.* (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007)).

Defendant's argument focuses on the third element, and in any regard I find that Plaintiff has produced sufficient evidence to establish the first and second elements. With respect to the first element, Plaintiff has not pointed to any cases specifically finding that a letter to a prison official is constitutionally protected activity, but it is clearly established that grievances are constitutionally protected.   *See, e.g.*, *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010).   Furthermore, in *Fogle v. Pierson*, 435 F.3d 1252 (10th Cir. 2006), the plaintiff had alleged that he was "complaining" about his placement in administrative segregation and threatening to file suit, and that in response, an official told him that if he did not stop complaining he would be transferred to long-term administrative segregation.   The Tenth Circuit held that these "'complaints' could be referring to internal prison appeals and/or formal grievances to prison officials" and that they were constitutionally protected activity.   *Id.* at 1264.   I find that Plaintiff's letters to Defendant, which undisputedly "intended to appeal his removal from population and placement in segregation" and "to express his grievance" regarding her racist treatment of him (Resp. 10; *see also* Reply 4 (admitting these facts)), constitute constitutionally protected activity.   I find that the second element is also established here, as placement or continued placement in segregation would "chill a person of ordinary firmness" from continuing to file complaints.   *See, e.g.*, *Fogle*, 435 F.3d at 1264.   I find that this is particularly true in light of the evidence presented by Plaintiff that Defendant confronted him about his letters and said she would send him to CSP and have him locked in administrative segregation for several years.

"The third prong requires the plaintiff to allege specific facts that, if credited, establish that 'but for' the defendant's improper retaliatory motive 'the incidents to which he refers, including the disciplinary action, would not have taken place.'" *Id.* (quoting *Peterson*, 149 F.3d at 1144).   "Substantial motivation" can be inferred where evidence shows that (1) the defendant was aware of the protected activity, (2) the plaintiff directed his complaint to the defendant's actions, and (3) the alleged retaliatory act was in close temporal proximity to the protected activity.   *Id.* (citing *Gee*, 627 F.3d at 1189). I draw this inference here for Plaintiff.   His evidence shows that he wrote several letters to Defendant regarding his segregation and her racist treatment, the latest of which was dated December 15, 2007; that Defendant decided to keep him removed from population on December 17, 2007; and that Defendant confronted him about the letters on December 18, 2007 and told him she would give him "several years" of administrative segregation.

Furthermore, Defendant is not entitled to qualified immunity on Plaintiff's retaliation claim.   "It is well settled that prisoners cannot be retaliated against when they exercise their First Amendment rights."   *Id.* (citing *Gee*, 627 F.3d at 1189; *Fogle*, 435 F.3d at 1264; *Peterson*, 149 F.3d at 1144; *Penrod v. Zavaras*, 94 F.3d 1399, 1404-05 (10th Cir. 1996); *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)).   Accordingly, I find that Plaintiff's retaliation claim survives summary judgment.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Defendant Major Linda Maifeld's Motion for Summary Judgment [ECF No. 97], filed September 15, 2011, is **GRANTED in part and DENIED in part**.   It is granted as to Plaintiff's procedural due process claim and denied as to his retaliation claim.

Dated:   September 24, 2012

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge